**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE DIAZ, BESSY FLORES,** | ) | |
| **RAMON PEÑA, ALBERTO** | ) | |
| **ROBLES and ROBERT VELA,** | ) | |
| | ) | **No. 08 C 6814** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **KRAFT FOODS GLOBAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs have sued defendant for its alleged violations of Title VII and 42 U.S.C. § 1981.

The case is before the Court on Kraft's Federal Rule of Civil Procedure ("Rule") 56(c) motion for

summary judgment. For the reasons set forth below, the Court grants in part and denies in part the

motion.

**<u>Facts</u>**

Plaintiffs, who are Hispanic, are or were employed by Kraft at its Tech Center in Glenview,

Illinois. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 1-2.) There are several "mini-factories" for product

development in the Tech Center that are collectively called the Pilot Plant. (*Id.* ¶ 23.)

Bessy Flores started working for Kraft in 1986 and spent the next ten years in the Sanitation

and Janitorial Departments. (*Id.* ¶ 8.) She transferred into the Shipping and Receiving ("Shipping")

Department in 1997 and worked there for nine years. (*Id.*) In November 2008, Flores transferred

back to Sanitation and has worked there ever since. (*Id.*) Flores has been an hourly employee

throughout her employment with Kraft. (*Id.*)

Jose Diaz started with Kraft in 1990 and worked in the Sanitation and Janitorial Departments for nine years. (*Id.* ¶ 9.) In November 1999, he transferred to Shipping, where he worked until he was terminated on November 15, 2008. (*Id.*) Diaz was an hourly employee throughout his employment with Kraft. (*Id.*)

Ramon Peña worked for Kraft as a part-time employee in Shipping from July 2000 through October 2006. (*Id.* ¶ 10.) He became a full-time Shipping employee in November 2006 and worked there until he was terminated on November 15, 2008. (*Id.*) Pena was an hourly employee throughout his employment with Kraft. (*Id.*)

Alberto Robles started with Kraft in 1987 and worked in the Sanitation and Janitorial Departments as an hourly employee until May 2001. (*Id.* ¶ 11.) In June 2001, he became a salaried, non-exempt senior technician in the Support Services Department, the position he holds today. (*Id.*)

Robert Vela started with Kraft in 1999 and worked as an hourly employee in the Sanitation Department until December 2001. (*Id.* ¶ 12.) In January 2002, he became a salaried, non-exempt senior technician in the Support Services Department, the position he holds today. (*Id.*)

Peter Michalec started with Kraft in 1986 as an hourly employee in the Sanitation Department. (*Id.* ¶ 15.) In 1989 or 1990, he transferred to Shipping. (*Id.*) Michalec became the coordinator of Shipping, which is a salaried position, in 1996 and its supervisor in 2000. (*Id.* ¶¶ 15-16.) In 2005, he became the supervisor of the Support Services Department as well. (*Id.* ¶ 16.) In November 2008, Michalec stopped supervising Shipping and became supervisor of Pilot Plant Services, which is comprised of the Building Operations Group, the Sanitation Department and the Support Services Department. (*Id.* ¶ 17.) From 2002 or 2003 through March 2009, Michalec

reported to Charles Shifflett, who was the Associate Director of Facilities for the Tech Center. (*Id.* ¶¶ 18-19.)

Kraft uses a posting process to fill available jobs. (Def.'s Resp. Pls.' Stmt. Add'l Facts ¶ 1.) A manager starts the process by sending a prospective job posting to Kraft's Human Resources Department ("HR"). (*Id.*; *see* Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ J., Ex. LL, Simmons Dep. at 23.) Once HR approves it, the posting goes to HR's Talent Acquisition Department, which puts it on Kraft's in-house website and/or distributes it internally on paper. (Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ J., Ex. LL, Simmons Dep. at 23-24.) Interested employees have a week or two after a job is posted to apply for it. (*Id.* at 24.) The applications are preliminarily reviewed by Talent Acquisition and then sent to the manager who initiated the process. (*Id.* at 24, 34-36.) The manager reviews the applications and any information from Talent Acquisition, recommends an applicant to his supervisor and HR, and the three make the hiring decision together. (*Id.* at 37-38.)

In July 2008, Michalec posted a senior technician salary grade 2 position. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 68.) Technicians assist product developers in various ways, including by ordering and restocking ingredients, running the milk system and setting up and running the equipment. (*Id.* ¶ 24.) The posting also says: "[M]inimum two years of experience in Mechanical knowledge[;] minimum of 2 years experience in Pilot Plant Operations[;] Knowledge of HACCP [food safety procedures] and Sanitation procedures[;] Ability to set up equipment ie pumps, grinders, homogenizers[;] Ability to operate and maintain equipment safely[.]" (Def.'s Summ. J. App., Ex. E, Vela Dep. Exs. 13 & 14, July 2008 Postings; *see* Def.'s Summ. J. App. Ex. N, Utzig Decl. ¶ 8 (explaining HACCP procedures).)

Diaz and Peña both saw the posting and put their names on the job sign-up sheet and Peña sent an application for the job and his resume to Karen Schroeder in HR as well. (Def.'s Summ. J. App., Ex. A, Diaz Dep. at 120-23; *id.*, Ex. B, Peña Dep. at 136-37, 146-47.) The sign-up sheet also contains the names of two other Hispanic employees, Alberto Lopez and Jesus Robles, and two African-American employees, Londale Stroud and Dee Hunt, but the last two names are crossed out. (Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot. Summ. J., Ex. B, July 2008, Technician Sign-Up Sheet.)

Shortly after the job was posted, Shifflett decided not to fill the position. (Def.'s Resp. Pls.' LR 56.1 Stmt. Add'l Facts ¶ 28; Def.'s LR 56.1(a) Stmt. ¶ 72.) He says he did so because he knew certain Tech Center Departments would shortly be eliminated and wanted all of the affected employees to have the chance to apply for the technician job. (*Id.*) Plaintiffs contend Shifflett's real reason for freezing the job was that the only names left on the sign-up sheet were Hispanic. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 72.)

In September 2008, Kraft announced that it would outsource the Tech Center's shipping functions and most of the maintenance functions to an outside contractor. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 35-37.)

On September 19, 2008, after the outsourcing was announced, Michalec posted two senior technician salary grade 2 positions. (*Id.* ¶ 73; *see* Def.'s Summ. J. App., Ex. E, Vela Dep. Exs. 18 & 19, September Technician Internet & Bulletin Board Postings.) The posting described the job duties as: "Doing weight conversion to order milk 2%. Setting up the milk system to receive milk 10%[.] Process milk 40%, CIP system 10%, Process I-Buy purchases 2%, equipment set up 6% and other duties assigned 30%[.]" (Def.'s Summ. J. App., Ex. E, Vela Dep. Exs. 18 & 19, Internet &

Bulletin Board Postings.)  The "[r]equired minimum qualifications" listed are:  two years of "[m]echanical knowledge" and "eexperinece [sic] with forklift," "[k]nowledge of HACCP and Sanitation procedures, "[a]bility to setup [sic] equipment (pumps, grinders, homogenizers)" and "[a]bility to operate and maintain equipment safely."  (*Id.*; *see* Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 75.)

Diaz and Peña say Michalec refused to let them apply for these jobs, a contention he disputes.  (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 117-18.)  Robles did not apply because he already had a senior technician salary grade 2 position.  (*Id.* ¶ 81.)  Vela had such a position as well, but he applied for the job because he thought that these technicians would perform only one function – processing milk.  (Def.'s Summ. J. App., Ex. E, Vela Dep. at 207-08.)  Pablo Arroyo, who is Hispanic, Jerlean Shack and Curtis Ward, who are African American and Jeffrey Ambrose, Robert Meyers, Matt Simeon and Maria Stachon Groblowy, who are Caucasian, also applied for the jobs. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 21-22, 49, 80.)

Michalec did not consider Vela for these jobs because Vela already had a senior technician salary grade 2 position.  (*Id.* ¶ 82.)  Michalec interviewed the other candidates and says he selected Ward and Meyers because of their "[s]trong mechanical skills."  (Def.'s Summ. J. App., Ex. F, Michalec Dep. at 146-47.)

On September 19, 2008, Michalec also posted five entry-level positions in the Sanitation Department.  (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 43-44.)  The posting described the job duties as:  "Sanitize pilot plant equipment, scrub floors, cooler and freezer cleanouts, foaming of pilot plant rooms, stock pilot plant inventory.  Set up footbaths in the pilot plants.  General housekeeping. Maintain floors in dry ingredient rooms."  (Def.'s Summ. J., App., Ex. F, Michalec Dep. Ex. 9 at

D000736.) The posting also said that a high school diploma, "1 year Pilot Plant experience . . . [m]echanic skills, forklift certifi[cation] & ability to lift 50 lbs [sic]" were required. (*Id.*)

Michalec made a list of the employees who were interested in the jobs, which contains the following names: Diaz, Peña, Flores, Simeon, Ward, Groblowy, Raul Fernandez, who is Hispanic, Demeather (Dee) Hunt, who is African American, and John Byrne, who is Caucasian. (Def.'s LR 56.1(a) Stmt. ¶ 118; Def.'s Summ. J., App., Ex. F, Michalec Dep. at 132-40; *id.*, Michalec Dep. Ex. 8 at D000749; Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 21-22, 49.) Michalec awarded the jobs to Fernandez, Simeon and Groblowy, for the day shift, and Flores and Hunt, for the night shift. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 53.) Kraft says the selection decisions were based solely on seniority, a contention plaintiffs dispute. (*Id.* ¶ 50; Def.'s LR. 56.1(a) Stmt. ¶ 50.)

In July 2008, Flores began a three-month disability leave. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 128-29.) In October 2008, Flores returned to work from disability leave and complained to Chad Simmons, an HR representative, that she had been awarded a night-shift sanitation job while Simeon had been put on the day-shift. (*Id.* ¶¶ 122-23, 129.) Flores says Simmons told Michalec about her complaint and, after he did so, Michalec retaliated against her by assigning her onerous tasks. (*Id.* ¶¶ 124-25.)

In October 2008, Diaz and Peña complained to Simmons and HR Vice President Gary Conte that they had not been given the sanitation or technician jobs because they are Hispanic. (*Id.* ¶¶ 106-09, 112, 115.) Simmons and Conte each spoke to Michalec and Shifflett about Diaz and Pena's concerns, reviewed the selection processes for the positions and concluded that nothing improper had occurred. (*Id.* ¶¶ 110-11, 113-14, 116.)

On November 6, 2008, Flores gave Michalec a doctor's note that restricted her from lifting more than twenty pounds and asked for a light-duty assignment. (*Id.* ¶ 130.) Michalec denied her request because, he says, Flores' job required her to lift more than twenty pounds regularly, her duties could not be assumed by another employee and there were no light-duty positions available. (Def.'s LR 56.1(a) Stmt. ¶¶ 131-33.) After her light-duty request was denied, Flores went back on short-term disability. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 136.)

At the end of December 2008, after her transfer to the sanitation job had taken effect, Flores again asked for light duty and again her request was denied. (*Id.* ¶¶ 137, 149.) Flores remained on short-term disability until February 2, 2009, when she returned to work without restrictions. (*Id.* ¶ 140.)

### Discussion

To prevail on a summary judgment motion, "the pleadings, the discovery and disclosure materials on file, and any affidavits [must] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Kraft contends that plaintiffs' section 1981 and Title VII national origin discrimination claims must be dismissed because section 1981 does not prohibit discrimination on the basis of

national origin and plaintiffs have no evidence to support their Title VII national origin claims. The Court agrees. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (holding that section 1981 prohibits discrimination on the basis of race, "ancestry or ethnic characteristics" but not on the basis of national origin). Kraft's motion for summary judgment on these claims is, therefore, granted.

Kraft also argues that it is entitled to judgment on some of plaintiffs' Title VII claims because they did not file timely EEOC charges on them. *See* 42 U.S.C. § 2000e-5(e)(1) & (3)(B) (requiring Title VII claimants to file an EEOC charge within 300 days of the contested employment action before filing suit but allowing disparate pay plaintiffs to "recover[] back pay for up to two years preceding the filing of the charge"); *Cheek v. W. & So. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (stating that a Title VII claim not raised in a timely EEOC charge generally cannot be asserted in court). Diaz's EEOC charge, filed October 22, 2008, asserts that Kraft denied him a sanitation job in favor of a less-qualified non-Hispanic employee. (Def.'s Summ. J. App., Ex. A, Diaz Dep. Ex. 78.) Peña's EEOC charge, filed November 21, 2008, states that Kraft discriminatorily denied him sanitation and technician jobs in favor of less-qualified non-Hispanic employees. (*Id.*, Ex. B, Pena Dep. Ex. 108, EEOC Charge.) Robles' charge, filed June 23, 2008, says that Kraft paid him lower wages than non-Hispanic employees. (*Id.*, Ex. D, Robles Dep. Ex. 51, EEOC Charge.) Vela's charge, filed November 14, 2008, says that he was unfairly reprimanded, deprived of overtime and paid time off and denied a technician job because of his ethnicity. (*Id.*, Ex. E, Vela Dep. Ex. 6, EEOC Charge.) Plaintiffs assert all of these claims in this suit. In addition, however: (1) Robles claims that Kraft discriminated against him by making derogatory comments in his draft 2007 performance review; (2) Peña claims that Kraft discriminatorily denied him a chemical job in 2007;

(3) Vela claims that Kraft has paid him less than his non-Hispanic counterparts; and (4) Diaz claims that Kraft discriminatorily denied him a technician job in 2008. (*See* Pls.' Resp. Def.'s Mot. Summ. J. at 5-7.) Robles' performance review claim and Peña's chemical job claim are based on events that occurred more than 300 days before they filed their EEOC charges and the lion's share of Vela and Robles' disparate pay claims are based on paychecks they received more than two years before they filed their EEOC charges. Plaintiffs contend that these claims are timely nonetheless, thanks to the continuing violation doctrine.

The Court disagrees. The continuing violation doctrine "allows [a plaintiff] to delay suing until a series of acts by a prospective defendant blossoms into a wrongful injury on which a suit can be based." *Lewis v. City of Chi.*, 528 F.3d 488, 493 (7th Cir. 2008). As the *Lewis* court noted, however:

> Despite its name, it is a doctrine about cumulative rather than continuing violation. A typical case is workplace harassment on grounds of sex. The first instance of a coworker's offensive words or actions may be too trivial to amount to actionable harassment, but if they continue they may eventually amount to an actionable pattern of harassing behavior. And then the entire series is actionable. If each harassing act had to be considered in isolation, there might be no actionable claim even when by virtue of the cumulative effect of the acts it was plain that the plaintiff had suffered unlawful harassment.

*Id.; see Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999) (explaining that the doctrine "saves" discrimination claims based on acts that occurred outside of the limitations period, if they are part of a pattern of discrimination that continued into the limitations period and can be recognized as actionable only when viewed in light of later events.) Thus, the doctrine has no application to claims based on discrete discriminatory acts like "termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

Kraft's creation of Robles' allegedly discriminatory performance review, disparate compensation of Vela and Robles more than two years before they filed their EEOC charges and denial of the chemical job to Peña are discrete discriminatory events to which the continuing violation doctrine does not apply. *Id.*; *see Hildebrandt v. Ill. Dep't Nat. Resources*, 347 F.3d 1014, 1027 (7th Cir. 2003) ("[E]ach of [plaintiff's] paychecks that included discriminatory pay was a discrete discriminatory act, not subject to the continuing violation doctrine."). Because the continuing violation doctrine does not save these untimely claims, the Court grants Kraft's motion for summary judgment on them.

Vela's claim for disparate pay he received within the two-year period before he filed his EEOC charge and Diaz's technician job claim are timely but not mentioned in their EEOC charges. Plaintiffs contend the omissions are harmless because their charges can be read to encompass these claims. That is true if the omitted claims are "like or reasonably related to" the allegations in plaintiffs' charges so that "the claim[s] in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek*, 31 F.3d at 500 (quotation omitted). Such is the case here. An EEOC investigation into Diaz's claim that he was discriminatorily denied a sanitation job would likely reveal that Kraft also denied him a technician job, which was posted on the same day and by the same supervisor as the sanitation job and was also awarded to a non-Hispanic employee. Similarly, an investigation into Vela's claim that he was disciplined more and given less overtime work and paid time off than non-Hispanic employees would likely uncover his disparate pay claim as well. Because these claims are fairly encompassed in Diaz and Vela's EEOC charges, they remain viable.

That leaves: (1) Flores' section 1981 and Title VII retaliation claims; and (2) the section 1981 and Title VII race discrimination claims based on Kraft's (a) denial of a day-shift sanitation job to Flores, (b) denial of sanitation and technician jobs to Diaz, Peña and Vela, (c) disparate compensation of Robles and Vela within the two-year period before they filed their EEOC charges, and (d) reprimands and denial of overtime and paid time off to Vela.

**Retaliation**

Flores can defeat Kraft's motion on her Title VII and Section 1981 retaliation claims either by offering evidence that: (1) she engaged in a statutorily protected activity, Kraft took adverse action against her and there is a causal connection between the two; or (2) after she engaged in protected activity, Kraft took adverse action against her and not any similarly situated employee who did not engage in protected activity, even though her job performance was satisfactory. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007). Flores contends that Michalec retaliated against her for her complaints of discrimination by assigning her more burdensome tasks than he assigned to other Shipping employees and denying her requests for light duty.[1] Viewed favorably to her, the record shows that Michalec assigned Flores to "clean[] leaves outside, mov[e] fiber drums, and clean[] the box room," after she complained to Simmons about the night-shift assignment, and denied her November and December 2008 light duty requests. (Pls.' Stmt. Add'l Facts ¶¶ 196, 200; Pls.' Resp. LR 56.1(a) Stmt. ¶¶ 131, 133, 137, 139.) The record shows, however, that these are typical Shipping tasks that Flores and others, including Michalec, had performed for

---

[1]Flores also cites her assignment to the night-shift as retaliation, but because she says the retaliation was prompted by her complaint to Simmons about that assignment, the assignment itself could not possibly be retaliatory. (*See* Pls.' Stmt. Add'l Facts ¶¶ 109, 111, 113-15.) .

years before she complained to Simmons and there is no evidence that suggests that she, and not other Shipping employees who did not complain, was the only employee assigned to perform these tasks in the thirty days she spent in Shipping after she complained to Simmons.  (Def.'s Summ. J., App., Ex. A, Diaz Dep. at 85, 117-18; *id.*, Ex. B, Peña Dep. at 71-72; *id.*, Ex. C, Flores Dep. at 93-94; Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 125; *see id.* ¶¶ 123, 130-36, 140.)  Further, Flores admits that she received 100% of her compensation throughout the three-month disability leave that resulted from Kraft's denial of her light-duty requests.  (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 136, 140.)  In short, the record does not suggest that Flores was treated more harshly than other Shipping employees after she complained or suffered any harm by the denials of her light-duty requests. Consequently, she has not raised a triable fact issue as to whether Kraft retaliated against her.


**Discrimination**

Plaintiffs can defeat Kraft's motion on their discrimination claims by using the direct method, *i.e.*, offering evidence of actions or comments that suggest bias, that Kraft gave "systematically better treatment" to similarly situated non-Hispanic employees or treated non-Hispanic employees more favorably for incredible reasons, or by using the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.792, 802 (1973).   *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719-21 (7th Cir. 2005) (quotation omitted); *see Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act.").  Plaintiffs say their claims survive under either method.

Flores' night-shift assignment claim survives summary judgment because she says Michalec told her he used race as a selection tool:

> I told [Michalec] that I would prefer to remain on days because I was the first woman that had worked for sanitation. . . . [A]nd he told me there was nothing he could do . . . because Matt Simeon[, who received one of the day-shift jobs,] is his best friend. He's white just like him, and he had family to take care [of].

(Pls.' App. Exs. Supp. Opp'n Mot Summ. J., Ex. BB, Flores Dep. at 43.)  Because this statement could be construed as an admission of discrimination, it defeats Kraft's summary judgment on Flores' claim.[2]

The other plaintiffs argue that Michalec's remark to Flores and other race-related statements he made are sufficient to suggest that discrimination motivated him to take the actions they contest. Robles testified about one such statement, which Michalec made to him in 1999.  At the time, Robles said, Michalec "was [his] buddy," and both men had just applied for the same maintenance job:

> [B]efore they never [sic] interviewed me, [Michalec] said up to me in the shipping dock . . . , "Al, I got the job from maintenance," and I says, "Pete, how do you know you got the job? I haven't even got interviewed yet?"  He said, "I got the job because I'm white and I'm right."

(App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. J, Robles Dep. at 213-14.)[3]  Viewed favorably to plaintiffs, this comment suggests that Michalec thought the unidentified manager in charge of the

---

[2]Because Michalec's statement to Flores pertained only to her shift assignment, it does not, by itself, defeat Kraft's summary judgment motion as to the other plaintiffs' discrimination claims but can be considered with any other circumstantial evidence of intent they adduce.  *See Olson v. N. FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004).

[3]Michalec did not, in fact, get the job.  (*Id.* at 216.)

1999 hiring decision was racist.  It does, not however, suggest that, a decade later, Michalec used race to make the hiring decisions plaintiffs contest.

Viewed in plaintiffs' favor, the record also shows that Michalec said "he did not like Spanish people" and told Flores "he wasn't discriminating against [them] . . . because [they] weren't a minority[,] . . . . [they] were a majority."  (Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. V, Casalan Decl. ¶¶ 3, 11; *id.*, Ex. BB, Flores Dep. at 182-84.)  These statements might support an inference of bias if Michalec made them near the time he made the decisions plaintiffs challenge.  But the evidence does not suggest that he did.  Carlos Casalan, who retired four months before the job postings at issue here, testified about the first comment, but did not say when, during his eighteen-year career with Kraft, he heard Michalec make it.  (*See id.*, Ex. V. Casalan Decl.)  Likewise, Flores, who has worked Kraft since 1986, could not recall any specifics about the conversation in which Michalec made the second comment:

Q.     When was this conversation?
A.     I don't remember.  I don't remember when it was.  I don't remember.
Q.     No idea at all?
A.     No. I don't have any idea.
Q.     Would anything help you remember?
A.     No.
Q.     Did anyone witness this conversation?
A.     I know that those two, they were always watching, and they would always be asking me "What happened?"
Q.     "Those two" meaning?
A.     Raoul [Fernandez] was there sometimes.
Q.     Well, who is the other one of the two?
A.     Ramon [Peña], Jose [Diaz] because we were all there in shipping.
Q.     So you think Ramon and Jose  –
A.     We were there.
Q.     – heard this conversation?
A.     I don't know.  We were just there.
Q.     So you don't know if anyone witnessed this conversation?
A.     I don't –  no.  No.  I don't believe so.  I don't think so.
Q.     And where was this conversation?

| A. | I don't know.  In the shipping, where we work, where we work. |
|----|------|
| Q. | Where in shipping? |
| A. | In shipping.  In shipping. |
| Q. | Where. |
| A. | Inside. |
| Q. | Where? |
| | . . . . |
| A. | Oh, my God.  How am I going to remember? |

(*Id.*, Ex. BB, Flores Dep. at 182-84.)  Because there is no basis for inferring that Michalec made these statements within days, months or even years of the actions plaintiffs contest, the statements do not suggest that his actions were discriminatory.

Viewed favorably to plaintiffs, the record also shows that Michalec:  (1) called plaintiffs "dummies" and "stupid"; (2) said "f*** you" and "suck my d***" to Hispanic employees; (3) told Robles, during his 2005 heart attack, to "Get the hell out my office.  Go die somewhere else"; and (4) called Robles "a f***ing gold digger," when he complained about his salary grade in 2007.  (*Id.*, Ex. V, Casalan Aff. ¶ 12; *id.*, Ex. CC, Robles Dep. at 226, 269; App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. F, Dus Dep. at 20.)  These remarks, though insulting and crude, do not have inherent racial or ethnic connotations, there is no evidence that Michalec added other language that gave these otherwise race-neutral words a discriminatory cast or that Michalec reserved such language solely for Hispanic employees.  *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 926 (7th Cir. 2000) (stating that calling an employee "'stupid,' while certainly not to be commended, does not amount to evidence of racial discrimination"); *Hardin*, 167 F.3d at 345-46 (saying that supervisor's general use of foul, but sexually- and racially-neutral, language does not support an inference of discrimination); *Suarez v. Kwoks Int'l Trading, Inc.*, No. 05 C 6979, 2007 WL 2874216, at *7 (N.D. Ill. Sept. 25, 2007) (evidence that supervisor said "'Mexicans are stupid,'" "use[d] . . . 'stupid Mexican' as an epithet," and, though he did not speak Spanish, used "Spanish-language

derogatory terms . . . when speaking to Hispanics" suggested racial harassment). In fact, the record shows that non-Hispanic employees were also on the receiving end of Michalec's verbal abuse. (App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. F, Dus Dep. at 81, 83 (testifying that Michalec made fun of Dus for being Polish and called a Caucasian employee "[s]tupid woman," "stupid hilly billy" and "dummy" ).) Accordingly, Michalec's use of insults and crude language does not suggest that he harbored ethnic bias.

Plaintiffs contend that Michalec's harsh treatment of them also evidences discriminatory intent. Viewed favorably to them, the record shows that Flores, Diaz and Peña were the only Shipping employees Michalec assigned to clean outside in winter and that he followed plaintiffs around while they worked but not "the rest" of the Shipping employees. (Pls.' Stmt. Add'l Facts. ¶¶ 61-62; App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. F, Dus Dep. at 24-25; Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. BB, Flores Dep. at 96-97, 286-87, 299-300; *id.*, Ex. DD, Pena Dep. at 63-64, 66-68; *id.*, Ex. Z, Diaz Dep. at 89.)[4] These facts would suggest bias if Flores, Diaz and Peña were the only Hispanic employees in the department. They admit, however, that Raul Fernandez, who is Hispanic, also worked in Shipping from 1997 through 2008. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 21.) Further, Fernandez says, without contradiction from plaintiffs, that Michalec did not give him "worse" assignments or less favorable treatment than he gave to non-

---

[4]Former employees Dus and Casalan also testified that Michalec required Diaz, Flores and Peña, but not non-Hispanic Shipping employees, to do "dirty" work beyond the scope of their job duties and work "outside in . . . dangerous weather." (*See* Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot. Summ. J., Ex. V, Casalan Decl. ¶¶ 4-7; App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. F, Dus. Dep at 40.) But Dus, a technician in the Pilot Plant, and Casalan, a Sanitation employee, do not explain how they have personal knowledge of the scope of the Shipping employees' jobs or the assignments Michalec gave to non-Hispanic employees of that department. Thus, they cannot testify about these issues.

Hispanic employees. (App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. N, Fernandez Aff. ¶¶ 2, 4-8.) Consequently, Michalec's following Flores, Diaz and Peña and assigning them "bad" tasks does not support an inference of bias.

The record also suggests that Michalec: (1) spied on plaintiffs while they worked; (2) yelled at them for working overtime; (3) made Flores work alone in the Morton Grove facility; (4) reneged on a promise to recommend Peña for a forklift job; (5) told another employee not to give Peña overtime; and (6) made a negative comment in a draft of Robles' 2007 performance review. (*Id.*, Ex. F, Dus Dep. at 63-64, 122-23; Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. BB, Flores Dep. at 395-96; *id.*, Ex. CC, Robles Dep. at178-80; *id.*, Ex. DD, Pena Dep. at 259-63, 275; *id.*, Ex. Z, Diaz Dep. at 89.) But it is undisputed that Michalec also spied on and gave overtime reprimands to non-Hispanic employees, and there is no evidence that he subjected Fernandez to, or spared the non-Hispanic Shipping employees from, the other conduct plaintiffs cite. This evidence does not, therefore, suggest that Michalec's contested actions were motivated by plaintiffs' ethnicity.

Plaintiffs also argue that an inference of discrimination arises from Kraft's failure to adhere to its own hiring procedures with respect to the technician and sanitation positions. Plaintiffs say the telling abnormality in the July 2008 technician process is that, after the job was posted and four Hispanic employees expressed interest in it, Kraft decided not to fill it. It is undisputed that Shifflett decided to "freeze" the position after it was posted and that the only names that appear intact on the sign-up sheet are Hispanic. (Def.'s LR 56.1(a) Stmt. ¶ 68; Def.'s Summ. J. App., Ex. E, Vela Dep. Ex. 17, Sign-Up Sheet; *see* Def.'s Resp. Pls.' Stmt. Add'l Facts ¶¶ 27-28.) But the sign-up sheet also contains the names of two African-American employees, which are crossed out. (Def.'s Summ. J. App., Ex. E, Vela Dep. Ex. 17, Sign-Up Sheet.) However, there is no evidence that suggests

Shifflett saw the sign-up sheet, with or without the African Americans' names on it, or knew whose names were on it, before he decided to freeze the position or that job freezes are extraordinary events at Kraft. Absent such evidence or any other facts that suggest Shifflett was motivated by bias, the record does not support the inference that Kraft did not fill the July 2008 technician job because of the applicants' ethnicity.

Plaintiffs also contend that there were anomalies in the September 2008 technician hiring process that suggest discrimination was afoot, including: (1) the lack of documents evidencing Talent Acquisition's involvement in the process; (2) Michalec's refusal to let Diaz and Peña apply for the jobs; and (3) Kraft's selection of candidates before the deadline for submitting applications had passed. The first purported "anomaly" is that Talent Acquisition was not involved in the September 2008 technician posting, a proposition that the record squarely refutes. (*See* Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 65 (admitting that Karen Schroeder is a Kraft "Talent Acquisition Specialist"); Def.'s Summ. J. App., Ex. G, Michalec Decl., Ex. 2, Email from Schroeder to Michalec of 9/29/08; *id.*, Ex. 3, Emails between Michalec & Schroeder of 9/29/08 & 9/30/08.)

The last two anomalies have evidentiary support but no probative value. Michalec's refusal to let plaintiffs apply for the jobs might suggest bias if he did not consider any Hispanic candidates for the jobs. But the record shows that he did. (*See* Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 80.) Moreover, there is no evidence that any Kraft employee is entitled to apply for every posted position or that Kraft hiring managers are required to consider any interested employee for every posted position. Accordingly, these asserted facts do not support an inference of bias.

Viewed favorably to plaintiffs, the record also shows that Michalec offered Meyers one of the technician jobs three weeks before the application deadline set forth in the posting.[5] (*See* Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot. Summ. J., Ex. FF, Meyers Dep. at 74; Def.'s Summ. J. App., Ex. E, Vela Dep. Ex. 18, Posting.) But there is no evidence that the offer barred any candidate of any ethnicity from participating in the process. In fact, it is undisputed that HR gave Michalec all of the technician applications it had received, including those of Vela and Pablo Arroyo, who is Hispanic, a week before Michalec offered Meyers the job. (Def.'s Summ. J. App., Ex. G, Michalec Decl., Ex. 2 Email from Schroeder to Michalec of 9/29/08; *id.*, Ex. 3, Emails between Michalec & Schroeder of 9/29/08 & 9/30/08; *id.*, Ex. T, Meyers Dep. at 74; Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 80.) Thus, the allegedly premature offer to Meyers is not a basis for inferring that the technician hiring decisions were based on race.

Plaintiffs contend that the process for hiring the sanitation workers also deviated from the norm because Michalec created a list of interested employees, rather than posting a sign-up sheet, and included employees who did not meet the posted qualifications. Though the record supports these contentions, neither implies discrimination. The record shows that sign-up sheets were used for the technician postings, but there is no evidence that they must be or generally are used for every posting. Moreover, plaintiffs admit that the applicant list Michalec assembled included four Hispanic employees, three Caucasian employees, and two African-American employees and the

---

[5]Plaintiffs argue, based on a handwritten note that appears on a copy of the September 2008 posting they produced in the litigation, that the application deadline was October 29, 2008. (Pls.' Stmt. Add'l Facts ¶ 39.) Kraft contends that the notation is inadmissible because there is no evidence to show when it was made or by whom. (*See* Def.'s Resp. Pls.' Stmt. Add'l Facts ¶ 39; Def.'s Summ. J. App., Ex. E, Vela Dep. Ex. 18.) Because Kraft cites the very same document, without any reservations, to support one of its own fact assertions, the Court deems Kraft to have waived this objection. (*See* Def.'s LR 56.1(a) Stmt. ¶ 73.)

record shows that he put Flores on the list even though she was home sick when he made it. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 49; App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. M, Hunt Dep. at 125-26.) In addition, plaintiffs admit that Flores was one of the applicants who did not have all of the posted qualifications. (Def.'s Summ. J. App., Ex. F, Michalec Dep. at 132-41; *id.*, Michalec Dep. Ex. 8 at D000749; *see* Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 21-22, 49, 53, 60.) In short, the record suggests that the sanitation hiring process may have been unusual, but it does not suggest that it was discriminatory.

Plaintiffs also argue that Kraft ignored their complaints of discrimination, another indicator of intent. It is undisputed that Shifflett did not investigate Diaz, Peña and Vela's complaints about the September 2008 hiring processes, but HR did. (*See* Pls.' Stmt. Add'l Facts ¶¶ 87, 93-94.) Moreover, Shifflett testified, without contradiction, that he did not investigate the complaints because he knew HR was doing so, and the record shows that his decision to defer to HR was consistent with Kraft's policy on the disposition of discrimination complaints. (Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. JJ, Shifflett Dep. at 12-15, 75; *id.*, Ex. QQ, Utzig 30(b)(6) Dep. at 23.) Thus, Shifflett's failure to investigate personally plaintiffs' complaints does not suggest bias.

Plaintiffs also contend that HR representative Sharmella Harris ignored their complaints. Viewed favorably to plaintiffs, the record shows that in 2007, Robles talked to Harris about his salary grade three or four times and Vela told her more than once that Michalec harassed him and unfairly assigned overtime. (Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. CC, Robles Dep. at 229; *id.*, Ex. KK, Harris Dep at 88-89; Pls.' Stmt. Add'l Facts ¶¶ 117, 121.) However, there is no evidence that suggests Robles and Vela told Harris they were being underpaid or harassed because they are Hispanic. The record also shows that Diaz and Peña told Harris in October 2008

that they had been discriminatorily denied technician and sanitation jobs, but there is no evidence that she ignored these or any other complaints. (Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. KK, Harris Dep at 88-89; Pls.' Stmt. Add'l Facts ¶¶ 123, 127-28; Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 106, 108.) In fact, Harris testified that she spoke to Michalec and/or her own boss about Vela's complaints, to Shifflett, Michalec and HR representative John Utzig about Robles' complaints and told Diaz and Peña to contact Chad Simmons, who had succeeded her as the Tech Center employees' HR representative, about their complaints. (Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. KK, Harris Dep. at 73-75, 77-80, 87-94; Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 105-06, 109.) The record does not, therefore, support the inference that Harris ignored plaintiffs' complaints.

Plaintiffs also take issue with Simmons and HR Vice President Conte's treatment of their complaints, arguing that they conducted sham investigations of the 2008 hiring processes. Among the evidence that supports their view, plaintiffs say, is the undisputed fact that neither man determined which of the sanitation job candidates had the longest tenure in the sanitation department before concluding that the hiring process was not biased. (Def.'s Resp. Pls.' Stmt. Add'l Facts ¶¶ 107, 159.) However, Simmons and Conte both said they believed the hiring decisions were based on seniority, rendering irrelevant the length of time each candidate logged in the sanitation department, and there is no evidence that impugns the sincerity of their belief. (*See* Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. LL, Simmons Dep. at 63-64, 71-74, 90-91; *id.*, Ex. NN, Conte Dep. at 26-27, 32-35.) On the contrary, it is undisputed that each candidate's seniority date is written next to his or her name on the sanitation job applicant list, Michalec hired the five candidates with the earliest seniority dates and Diaz and Peña's seniority dates are later than the candidates who

were hired. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 52-53[6]; Def.'s Summ. J. App., Ex. N, Utzig Aff. ¶ 5.)

It is also undisputed that Simmons and Conte discussed the technician candidates' qualifications with Michalec and Shifflett but did not independently assess whether Ward and Meyers were more qualified for the jobs than Diaz and Peña. (*See* Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. LL, Simmons Dep. at 67-68; *id.*, Ex. NN, Conte Dep. at 47-51, 63.) But there is no evidence to suggest that Simmons, Conte or any other Kraft HR representative usually makes such assessments or even that they are able to do so. (*See* Pls.' App. Exs. Supp. Br. Opp'n Mot. Summ. J., Ex. LL, Simmons Dep. at 5-7, 32-34 (testifying that he has extensive HR experience but does not know what mechanical experience, knowledge of HACCP procedures or the other qualifications listed in the posting actually entail).) Absent evidence that Simmons and Conte could and should have determined on their own which candidates were bested suited for the technician jobs, and plaintiffs have offered none, their failure to do so does not suggest discriminatory intent.

Plaintiffs fare no better with their assertion that Simmons' failure to ask Michalec and Shifflett whether the hiring decisions were discriminatory casts doubt on the integrity of his investigation. Simmons admits that he did not use the word "discrimination" when he discussed the hiring processes with them but says the omission was deliberate: "[M]y focus was . . . to gather the information to make a determination of whether there was discrimination [rather than]

---

[6]Plaintiffs object to the seniority dates Kraft asserts in paragraph 53 of its fact statement because the declaration offered as support is not "the best evidence" of the dates. (Pls.' Resp. LR 56.1(a) Stmt. ¶ 53.) Even if that is true, an issue the Court does not decide, the fact that the seniority dates are offered in an inadmissible form would not be a basis for disregarding them. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994) (stating that evidence offered on a summary judgment motion must be admissible in "content . . . rather than . . . form").

communicating [to Michalec and Shifflett] that this is a – discrimination investigation." (*Id.*, Ex. LL, Simmons Dep. at 63.) Thus, Simmons says, he asked Michalec and Shifflett for information "to determine how a person was chosen, . . . whether the individual was being considered for the position or not, and, . . . if not, why not, and if they were considered for the position, why they were not selected." (*Id.* at 62.) Given this undisputed testimony, Simmons' failure to accuse Michalec and Shifflett of discrimination does not render his investigation suspect.

Vela and Robles also argue that John Utzig, Associate Director of Kraft HR, turned a deaf ear to their complaints. It is undisputed that Robles asked to meet with Utzig in May or June 2008, but no meeting occurred. (*Id.*, Ex. MM, Utzig Dep. at 41.) However, Utzig testified, without contradiction, that he "attempted to meet with [Robles] . . . on a number of occasions, and we weren't able to meet . . . . [a]nd then when I finally tried to schedule again, he said he couldn't meet with me because of legal reasons." (*Id.* at 42.) Vela also went to Utzig in 2008, claiming that Michalec had wrongly disciplined him for working overtime without authorization and was harassing him, and there is no dispute that Utzig's investigation of this complaint consisted solely of speaking to Vela and Michalec and reviewing a few documents. (Pls.' Stmt. Add'l Facts ¶¶ 136-39; App. Def.'s Resp. Pls.' Stmt. Add'l Facts Ex. P, Utzig Dep. at 16-17.) But Utzig testified, without contradiction, that his investigation of the discipline was brief because Vela "admitted . . . that he did not get [overtime] approval." (App. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. P, Utzig Dep. at 19.) Also unrebutted is Utzig's testimony that Vela refused to give him any information about the alleged harassment, though Vela claimed to have kept a log of "all the things that were going on," so Utzig could investigate. (*Id.* at 19-23.) Given these undisputed facts, Utzig's treatment of Vela and Robles' complaint does not support in inference of bias.

Next, plaintiffs argue that an inference of bias arises from the fact Kraft hired unqualified non-Hispanic employees for the posted jobs or otherwise treated non-Hispanic employees more favorably than plaintiffs without any credible reason for doing so.[7] There is no evidence, however, that Kraft gave non-Hispanic employees more favorable treatment with respect to overtime, paid time off and reprimands than it gave to Vela. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 182, 185, 193, 197.) Thus, Kraft is entitled to judgment as a matter of law on these claims.

With respect to the technician jobs, it is undisputed that the September posting said the "[r]equired minimum qualifications" were two years of "[m]echanical knowledge" and forklift experience, "[k]nowledge of HACCP and Sanitation procedures," the "[a]bility to setup [sic] equipment (pumps, grinders, homogenizers) . . . [and] operate and maintain equipment safely." (Def.'s Summ. J. App., Ex. E, Vela Dep. Exs. 18 & 19, Postings.) It is also undisputed that Diaz, Peña, Meyers and Ward did not have the HACCP and sanitation knowledge required by the posting and all of them would have to be trained to process milk. (*See* Def.'s Resp. Pls.' Stmt. Add'l Facts ¶ 44; Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 89, 93-94.) But, viewed favorably to plaintiffs, the record shows that all four men had mechanical knowledge, forklift experience, knew how to set up pumps or grinders and were familiar with some of the Pilot Plant equipment because they had installed, repaired or cleaned it. (*See* Def.'s Summ J. App., Ex. A, Diaz Dep. at 53-58, 186-189; *id.*, Ex. B, Peña Dep. at 30-32, 138-39, 178-80, 211-12; *id.*, Ex. T, Meyers Dep. at 38-42, 53, 61, 63; *id.*, Ex. U, Ward Dep. at 36-55, 67-68, 104-05; Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot. Summ. J.,

---

[7]Evidence of this nature can support an inference of bias either under the direct method of proof or the indirect method. *See McDonnell Douglas*, 411 U.S. at 802; *Rudin*, 420 F.3d at 719.

Ex. M, Diaz Aff; *id.*, Ex. N, Peña Aff.)  Moreover, it is reasonable to infer, given the fact that he had

been a technician since 2002, that Vela had these qualifications as well.

Kraft claims that it did not consider Vela for the September 2008 jobs because he already

had a technician position with the same duties and pay grade.  (Def.'s LR 56.1(a) Stmt. ¶ 82.)  Vela

says that explanation is false because the September 2008 technicians only had one task, processing

milk, while he was required to perform a variety of functions.  But the record shows that milk

processing was not expected to be, and is not, the September hires' only task.  (*See* Def.'s Summ.

J. App., Ex. E, Vela Dep. Exs. 18 & 19, September Postings (stating that seventy percent of the

technicians' time would be spent on milk processing and thirty percent would be spent on "other

duties assigned"); *id.*, Ex. U, Ward Dep. at 14 (stating that he spends seventy percent of his time

processing milk); Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 24, 34, 74, 104 (admitting that technicians

have been trained to, and do perform a variety of functions, Michalec planned to cross-train the new

technicians and Vela's work would be no different if he had been given one of the September 2008

technician jobs).)

Vela's claim that the September technician jobs have a higher salary grade than his job is

similarly unsupported.  Though, as Vela points out, Ward and Meyers' 2008 performance reviews

state that Ward is grade 3 and Meyers is grade 4, they also say the men's respective job titles are

maintenance engineer and maintenance coordinator, the titles they held before they became

technicians in November 2008.  (*See* Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot. Summ. J., Exs.

E & G, Meyers & Ward's 2008 MAPs.)  Moreover, Ward, Meyers and Michalec all testified,

without contradiction, that these documents are just what they appear to be, reviews of the work

Ward and Meyers did for the first ten months of 2008.  (Def.'s Summ J. App., Ex. T, Meyers Dep.

at 91; *id.*, Ex. U, Ward Dep. at 113-16; App. Exs. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. G, Michalec Decl. ¶¶ 8-9.)

Further, the compensation memoranda Vela cites, which say that Ward and Meyers' new titles and pay grades, technician grade 2, "will be effective January 1, 2009," seem to refute, not support, Vela's case. (*See* Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot. Summ. J., Ex. F, Mem. from Clark to Meyers of 3/9/09; *id.*, Ex. H, Mem. from Clark to Ward of 3/9/09.) Vela contends, however, that the contents of the documents is belied by the fact that they were issued "six months after [Ward and Meyers] were awarded the [technician] position[s]." (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 97.) The record does not show when the jobs "were awarded," but it is undisputed that Ward and Meyers started the jobs in November 2008, three months before HR issued these memoranda. (Def.'s App. Exs. Supp. Summ. J., Ex. T, Meyers Dep. at 55; *id.*, Ex. U, Ward Dep. at 114.) Absent evidence that Kraft usually issues such documents more quickly, and plaintiffs offer none, the fact that Meyers and Ward started as technicians before the memoranda were issued does not suggest that the information in them is false.

In short, the record does not suggest that the job duties or pay grades of the September technician jobs differ from those of Vela's technician job. Consequently, Vela has not raised a triable fact issue as to whether Kraft's proffered reason for denying him the September technician job is a pretext for discrimination.

Nor have Diaz and Peña, who were not hired as technicians, Kraft says, because their mechanical skills were lacking. (Def.'s LR 56.1(a) Stmt. ¶ 84.) Plaintiffs say that explanation is unworthy of belief because mechanical skills are not that valuable to technicians. But the evidence tells a different story. Both the July and September 2008 postings state that the technician job

requires mechanical knowledge and the ability to set up and operate equipment safely. (Def.'s Summ. J. App., Ex. E, Vela Dep. Exs. 13 & 14 (July 2008 Postings) & Exs. 18 & 19 (September 2008 Postings).) Robles, who has been a technician since June 2001, testified that his mechanical skills are a "great" help in his job because:

> [T]he equipment that we use is all mechanical. There's a lot of mechanical things involved in the way machines run and stuff like that, like your homogenizers they run a certain way. Without a technical background or mechanical ability, you could still learn, but having the mechanical ability you learn even faster when it comes to someone training you off the top.

(*Id.*, Ex. D, Robles Dep. at 128-29.) He also said his mechanical abilities enabled him to learn the milk processing system very quickly. (*Id.* at 132.) Similarly, Vela, who has been a technician since January 2002, testified that mechanical ability is "a plus" and that milk processing is a "very technical" task that involves "a lot of switching and a lot of knowing the milk, the processing itself, troubleshooting." (*Id.*, Ex. E, Vela Dep. at 121, 137.) Moreover, among the strengths Michalec noted in Robles' performance review for 2007, the year before the events at issue here, are: "Learning on the Fly[:] When it comes to technical skills [Robles] has a canny ability to pick things up and retaining what he has learn [sic]"; and "Problem Solving[:] [I]t amazes himself [sic] that trouble shooting is a part of life that come [sic] so easy to him when he addresses the problems at hand." (*Id.*, Robles Dep. Ex. 59, 2007 MAP.) In short, the undisputed facts cast no doubt on the veracity of Kraft's stated desire to hire technicians with strong mechanical skills.

Moreover, the record clearly supports Kraft's assertion that Ward and Meyers had superior mechanical skills. Diaz and Peña testified that their mechanical skills are derived from helping out at friends' auto shops and periodically cleaning the Pilot Plant machines. (*Id.*, Ex. A, Diaz Dep. at 53-58; *id.*, Ex. B, Peña Dep. at 30-32, 138-42, 211-12; Pls.' App. Exs. Supp. Br. Opp'n Def.'s Mot.

Summ. J., Ex. M, Diaz Aff. ¶ 3; *id.*, Ex. N, Peña Aff. ¶ 3; *see* Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 89-90.)  Meyers, by contrast, testified that he is a licensed stationary engineer, went to refrigeration school, attended seminars on pump rebuilding, and spent twenty years repairing and maintaining the freezers, coolers, pipes and equipment in the Tech Center and Pilot Plant.  (Def.'s App. Exs. Supp. Summ. J., Ex. T, Meyers Dep. at 14, 38-45, 51-54, 62-63.)  Ward is also a licensed stationary engineer, has a refrigeration license, spent ten years operating the heating, air conditioning, and hot water systems for the Tech Center and Pilot Plant and five years installing equipment in the Pilot Plant.  (*Id.*, Ex. U, Ward Dep. at 23-24, 36-55, 67-68, 104-05.)  Given this undisputed evidence, Diaz and Peña have not raised a genuine issue for trial on pretext.

Diaz and Peña also have not raised a triable fact issue with respect to pretext for the sanitation jobs.  It is undisputed that at least one of the non-Hispanic employees Kraft hired, Growblowy, did not have all of the qualifications set forth in the job posting.   (*See* Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 60; Def.'s Summ. J. App., Ex. F, Michalec Dep. Ex. 9 at D000736, Sanitation Posting.)  Plaintiffs say Kraft's explanation for that fact, that the sanitation hires were based on seniority (Def.'s LR. 56.1(a) Stmt. ¶ 50), is unworthy of belief because there is no written policy stating that seniority may be used as a selection tool and Kraft's decision use it in this case is not recorded in any document.  Those facts are undisputed and might suggest ethnic animus if using seniority excluded Hispanic employees from the process.  But the record shows that it did not.  (*See* Pls.' Resp. LR 56.1(a) Stmt. ¶¶ 53, 60 (admitting that Flores, who does not have the posted qualifications, and Fernandez, were two of the five employees hired).)  The record also shows that: (1) Kraft has no written policy forbidding the use of seniority as a selection tool (*id.* ¶ 51); (2) Flores was able to transfer from Sanitation into Shipping in 1996 on the basis of seniority (Def.'s Summ.

J. App., Ex. C, Flores Dep. at 73-77); (3) Michalec wrote seniority dates next to each name on the candidate list and wrote the numbers 1-5 next to the names of the candidates with the most seniority (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶ 52); (4) Fernandez, Simeon, Growblowy, Flores and Hunt, who were hired, have respective seniority dates of January 19, 1981, August 19, 1985, May 5, 1986, November 13, 1986 and October 3, 1988 (*id.* ¶ 53)[8]; (5) Diaz and Peña's seniority dates are May 14, 1990 and July 11, 2000, respectively (Def.'s App. Exs. Supp. Summ. J., Ex. N, Utzig Aff. ¶ 5(s), (t)); and (6) Michalec, Shifflett, Simmons and Conte all testified that the hiring decisions were based on seniority (*id.*, Ex. F, Michalec Dep. at 124-25; *id.*, Ex. H, Shifflett Dep. at 30-32; *id.*, Ex. K, Simmons Dep. at 63, 71; *id.*, Ex. M, Conte Dep. at 33). Given the undisputed evidence, there is no triable issue of fact as to whether Kraft used seniority as a pretext for discrimination.

Robles and Vela fare no better with their disparate pay claims. It is undisputed that both men have been at salary grade 2 since they became technicians in 2001 and 2002, respectively. It is also undisputed that Meyers and Ward, who were hired for grade 2 technician jobs, are currently being paid at grades 4 and 3, respectively. (Def.'s Resp. Pls.' Stmt. Add'l Facts ¶¶ 181, 184.) Kraft says Meyers and Ward are temporarily being paid at higher grades in accordance with its "redlining" policy, under which Kraft pays employees whose jobs it eliminates and take lower-paying jobs with the company as a result, at their former pay grade for two years after they transfer to the lower-paying position. (Def.'s LR 56.1(a) ¶ 97; Def.'s App. Exs. Supp. Summ. J., Ex. N, Summary of 2008 Compensation Administrative Guidelines.)

Plaintiffs contend that Kraft's explanation is incredible because Ward and Meyers' 2008 performance reviews, which say that Ward is grade 3 and Meyers is grade 4, and the compensation

---

[8]*See* n.6.

memoranda that describe the redlining policy's impact on them, were not issued until after the men were working as technicians.  (*See* Pls.' App. Supp. Br. Opp'n Def.'s Mot. Summ. J., Ex. F, Mem. from Clark to Meyers of 3/9/09; *id.*, Ex. H, Mem. from Clark to Ward of 3/9/09; *id.*, Exs. E & G, Meyers & Ward 2008 MAPs.)  But, as discussed above, plaintiffs have nothing but their own speculation to support the notion that the reviews pertain to Ward and Meyers' work as technicians or the memoranda were belatedly ginned up to paper over discrimination.  (*See* Def.'s Summ. J. App., Ex. T, Meyers Dep. at 91; *id.*, Ex. U, Ward Dep. at 114-16; App. Exs. Def.'s Resp. Pls.' Stmt. Add'l Facts, Ex. G, Michalec Decl. ¶ 8.)

## Conclusion

For the reasons set forth above, the Court finds that there is no genuine issue of material fact and Kraft is entitled to judgment as a matter of law on:  (1) all plaintiffs' section 1981 and Title VII national origin discrimination claims; (2) Flores' Section 1981 and Title VII retaliation claims; and (3) Robles, Vela, Diaz and Peña's section 1981 and Title VII discrimination claims.  Kraft's motion for summary judgment [doc. no. 104] is granted as to these claims and denied as to Flores' section 1981 and Title VII discrimination claims, which are the only claims that remain in this suit.

**SO ORDERED.**                                    **ENTERED:**


**May 27, 2010**

_Ronald A. Guzman_

—————————————————————
**HON. RONALD A. GUZMAN**
**United States District Judge**